Todd Blanche
Attorney General of the United States
Lisa Cartier-Giroux
Rebecca R. Perez
Assistant United States Attorneys
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JAC DALITSO ARCHER,<br><br>Defendant. | Case No.: 2:25-CR-00113-RLP-9<br><br>United States' Response to Defendant's Rule 29 Motion (ECF 429) |

Plaintiff, United States of America, by and through Lisa Cartier-Giroux and Rebecca Perez, Assistant United States Attorneys for the Eastern District of Washington, submit the following Response to Defendant Archer's Rule 29 Motion for Judgment of Acquittal (ECF 429). The United States responds as follows.

**INTRODUCTION**

Defendant was convicted after trial. That conviction was based on evidence presented, proving beyond a reasonable doubt to a jury that Defendant conspired with others to impede officers, using force, intimidation, or threats; or by intending to cause property damage. The simple fact that there were words spoken, or individuals assembled, does not mean the conduct was protected by the First Amendment. And the fact that there may have been a political motivation behind Defendant's presence that day does not matter. In general, much of the criminal

conduct which occurs involves an individual or group doing something which, taken in an isolated context, might be considered non-criminal or perhaps protected by the Constitution. Individuals are certainly permitted to travel on highways, but not while transporting controlled substances or doing so to further a conspiracy to traffic in controlled substances. Similarly, individuals may choose to apply for loans, but not if done by providing false financial information. And most individuals may possess firearms, but not if done where the possession of the firearm is to compel another's behavior.

So too here. As was extensively briefed during pretrial litigation, individuals may gather to protest or to express any matter of political opinion. They may do so loudly and frequently, if they so choose. But that is not what happened here, and not what this case is about. Defendant chose to organize co-conspirators who agreed to impede officers by using force, intimidation, and threats, and to damage property for the same purpose. They saw a void in leadership and chose to not just express an opinion, but form an aggressive group of co-conspirators, in hopes that the federal agents would be forced to bow to their demands and succumb to their pressure. They chose to work with others to lay siege to the federal Homeland Security Investigations ("HSI") building, trapping agents, civilians, and detainees inside for hours to pressure them to release the detainees by preventing them from being able to leave with them and transport them to Tacoma.

Here, a claim of free speech or First Amendment does not protect Defendant. Defendant brings the same arguments made and decided during pretrial motion practice. This Court denied the motion to dismiss at that time. Now, the evidence demonstrating Defendant's conduct has been presented to a jury, who after careful consideration of the law and the evidence, found them guilty. This Court again should deny Defendant's motion.

## FACTS

The United States hereby incorporates the general factual summary at ECF 446, Response to Forral Rule 29 and Rule 33 Motion.

## ARGUMENT

Under Federal Rule of Criminal Procedure 29, a court may enter a judgment of acquittal when "evidence if insufficient to sustain a conviction." Courts have consistently held that "evidence supports a conviction if, in viewed in the light most favorable to the government, it would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *See eg United States v. Graf,* 610 F.3d 1148, 1166 (9th Cir. 2010); *see also United States v. Johnson*, 297 F.3d 845, 868 (9th Cir. 2002) (a Rule 29 motion will be granted "only if viewing the evidence in the light most favorable to the government, and granting to the government all reasonable inferences that may be drawn from the evidence, no rational trier of fact could find beyond a reasonable doubt that the defendant committed the crime"); *United States v. Disla*, 805 F.2d 1340, 1348 (9th Cir. 1986) ("A conviction is supported by the evidence if, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences, there was relevant evidence from which the jury could reasonably have found the defendant guilty beyond a reasonable doubt."); *United States v. Hazeem*, 679 F.2d 770, 772 (9th Cir. 1982) (in deciding a Rule 29 motion, the "trial court must determine whether, viewing the evidence in the light most favorable to the government, the jury could reasonably find the defendant guilty beyond a reasonable doubt"). Such motions may be made before submission of the case to the jury, or after the jury verdict. Fed. Crim R. 29(a), (c).

A "rational juror" may make reasonable inferences from both direct and circumstantial evidence, and circumstantial evidence alone may be sufficient to form a basis for conviction. *United States v. Yoshida,* 303 F.3d 1145, 1151 (9th Cir. 2002); *United States v. Reyes-Alvarado,* 963 F.2d 1184, 1188 (9th Cir. 1992).

And importantly, juries are not required to believe any particular witness—jurors are the finders of fact, who weigh and determine the credibility (or not) of a witness. *United States v. Scheffer,* 523 U.S. 303, 313 (1998); *United States v. Cordova Barajas,* 360 F.3d 1037, 1041 (9th Cir. 2004) (stating that the jury was free to disbelieve defendant's testimony and infer the opposite of the testimony to support its verdict.). As the Ninth Circuit has stated, in considering a Rule 29 motion, a court "must bear in mind that it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts". *United States v. Rojas,* 554 F.2d 938, 943 (9th Cir. 1977). And importantly, "any conflicts in the evidence are to be resolved in favor of the jury's verdict." *United States v. Alvarez-Valenzuela,* 231 F.3d 1198, 1201-02 (9th Cir. 2000).

Here, a jury found Defendant guilty, specifically finding 1. That Defendant conspired to prevent by force, intimidation, or threat any officer of the United States from discharging their official duties, 2. That Defendant conspired to injure the property of any officer of the United States on account of their lawful discharge of duties or while engaged in the lawful discharge of duties, and 3. That Defendant aided and abetted another to conspire to impede or injure any officer of the United States in the discharge of their official duties. ECF 367. Defendant contends that the United States failed to prove the elements required for a conviction under 18 U.S.C. §372.

**1. Elements of § 372**

The elements of § 372, as delineated in the Court's final instructions to the jury, are as follows:

> First, on or about June 11, 2025, there was an agreement between two or more persons, in any State, Territory, Possession, or District of the United States to do one or more of the following:
>
> A. to prevent by force, intimidation, or threat, any officer of the United States from discharging any of their official duties; or

> B. to injure the person of any officer of the United States on account of their lawful discharge of their official duties or while they were engaged in the lawful discharge of their official duties; or
> C. to injure the property of any officer of the United States on account of their lawful discharge of their official duties or while they were engaged in the lawful discharge of their official duties; or
> D. to injure the property of any officer of the United States so as to molest, interrupt, hinder, or impede them in the discharge of their official duties.
>
> Second, the Defendant became a member of the conspiracy knowing of its purpose and intending to help accomplish that purpose; and
>
> Third, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

ECF 361. The question for this Court is whether, in light of all of the evidence presented over the entirety of the trial, and giving deference to the jury's verdict, a rational jury could have found that those elements were met.

**2. Defendant's Conduct Met the Elements of § 372**

Was evidence presented which could have led the jury to conclude that an agreement between two or more persons existed? The answer is surely yes. The United States presented hours of video footage, as depicted in exhibits 5-74 and 86-88, showing the events outside the HSI building in Spokane from approximately noon until 9pm on June 11, 2025. Those exhibits depicted an initially small gathering, but eventually hundreds of people gathered in the one block surrounding the HSI facility. The video showed a group of individuals who were charged as co-conspirators, including Defendant, who was repeatedly seen working together at different locations in an effort to prevent the federal officers from leaving the federal facility or having a means of transporting the detainees to Tacoma. Trial Exhibit 77 is a copy of Defendant's Facebook post, encouraging individuals to "come down now", stating "there is a non-zero chance we can wait

out ICE and free this man." The post further stated "some contingents are choosing to risk arrest and block the exits to ICE. We're about 100 strong in total. I hope to see you here." Trial Exhibit 78 further showed Defendant's group messages to various groups throughout the afternoon, spreading the post and encouraging people to come to the federal facility, including Defendant's co-conspirator and employee, Forral.

Trial Exhibits 8 through 16 showed Defendant and others' conduct at the white bus, located on the north side of the facility. Defendant was shown moving throughout the crowd with a clipboard, organizing and making lists of those willing to engage in conduct that could result in arrest. Trial Exhibit 6 showed an interaction at the white bus with law enforcement, with an ICE agent asking people to move, and those people indicating they would not. Trial Exhibit 7 showed Defendant with a megaphone, sitting in front of a bus, further coordinating those willing to engage in unlawful conduct. The area in front of the white bus was not violent and there was no force. The time in front of the white bus (from approximately noon until approximately 5:30 p.m.) demonstrated that persons, including Defendant, would not comply with multiple repeated requests by law enforcement to clear area between the HSI building at the white bus, a distance of a few feet. *See eg* Trial Exhibit 6, showing the approximate distance from the building to the bus. Agents testified that they observed Forral park their car to pin in the bus, and people crawling under the bus in the area of the cab. Multiple federal law enforcement witnesses testified to the effects of this organized group of people and their activities at the bus—it prevented them from transporting the detainees to the white bus, due to the blocking of the door but also crawling underneath and around the bus in a way that led those officers to suspect tampering. Further, the overall tenor of the group outside caused concern about how the issue would resolve without the involvement of a larger number of law

enforcement officers. ECF 33-12 at 7-8 (McIntosh), ECF 433-1 at 19-20 (Tomaso), ECF 433-2 at 15-16 (Burlingame).

Then, around 5:30 p.m., the events at the south gate unfolded, as depicted in Trial Exhibits 18-27. Three ICE agents walked out of the south side of the HSI facility into a gated parking area to find another way of exit, hoping to leave the facility and avoid the larger contingency on the north side of the building. Trial Exhibits 18-19. There were a few individuals in the south area; at that time the majority of the crowd was still centered on the north side. *Id.* The agents reached their vehicles and began driving toward the south gate to exit the fenced area and leave the facility. *Id.* As this was happening, co-defendant Mavawalla, seeing them trying to escape, began sprinting towards the south gate, reaching it at the exact moment the first vehicle driven by Officer Kevin Wilks would have been able to exit. Trial Exhibits 19-22. Dozens of individuals followed co-defendant Mavawalla to block the gate, including Defendant, who was seen running from the north side to the south. *Id.* As Defendant reached the south gate, they immediately began coordinating, stating "okay, people risking arrest are here." And then yelling "if you're rising arrest, this what we talked about, we're linking arms". Trial Exhibit 23. Defendant then organized those willing to act as the first line and barrier to the vehicles, standing in the middle of the open gate and grabbing onto the people on either side of them. Trial Exhibit 88. Prior to Defendant's arrival, the crowd was not linked and was simply standing in an unorganized fashion at the south gate. *Id.*

Federal agents, who were watching the events unfold, left the building and arrived to help the three officers inside the secure lot; they began moving together in a line attempting to break the line of the group blocking the exit.. Although the officers were visibly larger than most of those at the line, the agents could not move Defendant or the others due to their linking arms and using their collective force to push and push back against agents. Trial Exhibits 22-26, 86-88. At one point, Defendant moved away from the front line, handed their belongings to

someone in the back of the crowd, and then moved again to the front and again linked arms. Trial Exhibit 22C. Based on the agents' inability to move the group blocking the gate being overnumbered and for fear of further escalation based on the group's reaction to basic pushing, they retreated into the gated area. Trial Exhibit 24. The gate was eventually closed and those at the gate cheered. Trial Exhibit 24. Agent Tomaso testified that following the closure of the gate, the crowd continued cheering and calling the six agents inside various names and insults. He also heard individuals saying "you can't leave, can you", "are you scared?", and "”you're scared? Are you looking at your phone? How much battery do you have?". ECF 533-1 at 70. SA Laforte heard others asking similar questions regarding his level of fear and telling him that police wouldn't be coming to help them. Those statements could not be attributed to any one person but came from those who blocked the south gate and had just pushed the agents back. Agents generally testified that during this time at the south gate, including while inside the gate, they felt threatened and concerned for their safety.

For the next hour or two, law enforcement remained in the building and did not attempt to leave. One agent went to the roof of the building to see all sides of the building. Even while in the roof, a person noticed the agent and began to yell and tell the agent to go kill himself. ECF 433-5 at 42. Agent Laforte testified that even while in the building, he felt threatened due to his complete inability to exit and the fact that they were completely surrounded. *Id.* at 43. During this time, while law enforcement was unable to exit the building, Defendant was moving throughout the crowd in the area outside the facility, coordinating and directing. Trial Exhibit 31 depicted Defendant pointing and directing, holding the megaphone they had previously used at the white bus. Trial Exhibit 32 depicted Defendant standing in a huddle, again appearing to direct, while several individuals including co-defendants Forral and Muncey just feet away carrying park benches to barricade the south gate. Trial Exhibit 36 depicted Defendant coordinating with co-defendant

Muncey, who was one of the primary actors in barricading the gates with various items. The entirety of the city block was surrounded by protestors. *See eg* Trial Exhibits 29-35.

At approximately 6:30pm, the events at the red van began to unfold. As depicted in Trial Exhibits 40-59, a red Border Patrol van drove to the east side of the facility, surrounded by Spokane Police Department vehicles and followed by unmarked Border Patrol vehicles. Within minutes, the caravan was surrounded by the crowd. Several individuals linked arms around the red van, the tire was slashed by co-defendant Ramirez, and objects were repurposed from the south gate where Defendant was standing guard and shoved under the red Border Patrol van and accompanying police vehicles. Trial Exhibits 41, 42, 55. Local law enforcement response increased to help the trapped federal agents, ultimately leading to the deployment of smoke and less-lethal munitions around 9pm. Only after a second round of munitions did the crowd finally disperse sufficiently that the federal agents and detainees could leave the building. Trial Exhibits 65, 67, 72, 73.

During this time (6:30 p.m. until late into the evening), Defendant remained at the south gate, a very short distance from Washington Street, where the deployment of smoke occurred. They sat at the gate, ensuring there would be no further efforts by law enforcement to leave through that exit which was no longer protected by a barricade. When smoke was deployed initially around 8:15 p.m., Defendant was at the south gate, using a megaphone to motivate their followers. Trial Exhibit 63. When some members of the crowd began running away from the smoke, Defendant and the group stationed at the south gate immediately sat down in front of the gate, anticipating law enforcement was making another exit attempt. *Id.*

In Defendant's own statements, as captured in a voice memo in their phone, Defendant described the events at the HSI building as "beautiful and organized" and "as a community, we were there for each other. We had plans, we

communicated information." Further, "we collectively made it so they had to deploy violence…I'm proud of us that we didn't just let them go, they had to show us who they are first." Defendant also described their thought-out plans to be prepared for arrest and confirmed that they were not going to allow anyone out of that gate. Trial Exhibit 78.

Based on these facts, a jury could reasonably have found that there was an agreement between multiple individuals, including Defendant. Hundreds of people did not spontaneously arrive at the same location, remain in usually-unoccupied area for hours, and engage in the same activities, shouting the same profanities, with the same demonstrated goal. And rational jury could conclude that the evidence showed Defendant was not simply a member of the coordination and agreement, but a leader. A rational juror could easily have observed Defendant moving around north, south, and east sides of the facility with a clipboard or megaphone, viewed their post and re-post encouraging others to come to the area, watched their conduct coordinating the linking of the arms, watched them push back and push against officers, and heard Defendant's pride in what occurred on June 11th including the local law enforcement's deployment of less-lethal munitions, and concluded that Defendant did indeed conspire with other persons to commit A and D as listed in the elements instruction, and aid or abet to do the same.

The agreement was not simply to stand peacefully. Throughout trial and briefing, the word "peaceful" has been used extensively to describe the events of June 11th. But saying something is peaceful or "legal protest" does not make it so. The events of that day can be given whatever label any of the attorneys choose to use, but the events themselves are depicted in the exhibits. A rational jury could have concluded that Defendant did indeed do exactly what they stated they wanted to do—force the police to use violence if they wanted to leave with the detainees, and they agreed with others to prevent them from doing so through the use of

force, intimidation, or threats, and by destroying officer's property. The hours of taunting, screaming, pushing, coordinated efforts, physically preventing law enforcement from leaving, using nearby objects from the park to barricade, blocking the exits, reacting within seconds to new efforts by law enforcement to leave could certainly be construed to a reasonable juror as proof beyond a reasonable doubt that the conspiracy was indeed to threaten, intimidate, or use force. The local law enforcement officers who responded to the scene hours into the siege testified it would not have been safe for anyone inside the building to attempt to leave. ECF 417 at 172-73 (Riggles); ECF 433-7 at 12, 16 (Gonsalves).

Additionally, based on the ongoing efforts to barricade and use calculated tactics to block officers, a rational jury could similarly have concluded that Defendant conspired to cause damage to government property, including the Border Patrol vehicle and the white bus being used to assist federal agents, as well as the gates which were stacked with items meant to cause damage to the gates if opened or damage vehicles attempting to exit.

And did Defendant become a member of that conspiracy knowing of its objects? Again, in light of the facts described above, a rational jury could have found that Defendant not only was aware of the intent of that conspiracy, but joined in and was a leader of it. Defendant themselves testified that their object was not merely to express an opinion, but to prevent officers from leaving in hopes that they would actually give up the detainees from the co-conspirators' pressure tactics. ECF 433-11 at 58.

While not necessary to convict, the jurors found that at least one of the members of the conspiracy performed an overt act in furtherance of that conspiracy. Here, there were hours-worth of overt acts, including linking arms, pushing federal agents, carrying benches in front of exits, continuing to sit in front of the gates, slashing tires, letting air out of tires, yelling to cover exits, and any number of other acts depicting in any of the United States' trial exhibits.

**3. The United States Did Not Constructively Amend the Indictment**

An argument regarding the constructive amendment of charges is not appropriate for Rule 29 motion. *United States v. Lopez*, No. 2:23-CR-00055-CDS-DJA, 2025 WL 1695358, at *13 (D. Nev. June 17, 2025).

Even so, there was no constructive amendment here. A constructive amendment occurs when a defendant is charged with one crime but is in effect tried for another. *See United States v. Pang,* 362 F.3d 1187, 1194 (9th Cir. 2004). Defendant claims there was no mention of injury to property in the indictment but ignores most of the language of the document itself.

Here, as stated in the indictment, Defendant was charged with conspiracy to injure the property of an officer of the United States in order to molest, interrupt, hinder, and impede him in the discharge of his official duties. ECF 1. The stated objects of the conspiracy in the charging indictment included the release of air from the tires, painting the windshield of the bus, blocking the gate, placing trash cans and other objects in front of exits, and slashing the tires of a red van—all acts which a jury could find to be property damage. *Id.* Defendant was tried and convicted for the same charges returned by the grand jury, and thus there was no constructive amendment.

**4. Defendant's Efforts to Impede Officers are Not Protected by the First Amendment**

Defendant's choice to spend over 9 hours on June 11th coordinating and participating in efforts to impede officers by committing A-D as listed in the elements instruction is not protected speech. It is true that words were said, and also that the stated motivation for Defendant's actions was to express political opposition to current policies. But a claim of "free speech" is not a free pass to do whatever a person wants.

**a. Standard of Review**

In a Rule 29 motion, the standard remains: the jury is the trier of fact, and every reasonable inference should be taken in favor of the jury's determination of the verdict. In *United States v. Hanna,* the Ninth Circuit considered a defendant's claim that insufficient evidence supported the jury. 293 F.3d 1080, 1087 (9th Cir. 2002). The Court noted that the case had been properly submitted to the jury—based on the material facts in dispute, the jury needed to act as a fact-finder regarding the circumstances of the threats in question. *Id.*at 1087. And following that jury verdict, "the appellate court defers to the jury's findings on all but the constitutional facts" which are facts which "determine the core issue of whether the challenged speech is protected by the First Amendment." *Id.* A reviewing court must defer to the jury's findings on other facts and credibility and then determine "whether the facts as found by the jury establish the core constitutional fact." *Id.* This includes deference to findings of credibility made by the jury. *Eastwood v. National Enquirer, Inc.,* 123 F.3d 1249, 1252 (9th Cir. 1997). In other words, the reviewing court makes a determination of "whether the believed conduct" constitutes a First Amendment violation. *Hanna,* 293 F.3d at 1088.

Similarly, in another Ninth Circuit case, the Court stated they would "consider the undisputed facts as true, and construe the history facts, the findings on the statutory elements, and all credibility determinations in favor of the prevailing party. In this way, we give appropriate deference to the trier of fact…yet assure that evidence of the core constitutional fact…falls within the unprotected category." *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1070 (9th Cir. 2002). Furthermore, the Ninth Circuit has implied that if the constitutional facts are subsumed within the elements, then the reviewing court will defer to the factfinder. *United States v. Keyser,* 704 F.3d 631, 639 (9th Cir. 2012).

Constitutional facts are the core aspect of the facts which removes the behavior from constitutionally protected behavior to criminal behavior. *Hanna,* 293 F.3d at 1088. For example, "actual malice" is required to prove defamation—otherwise, the statements may be mean or false, but will still be protected by the First Amendment. *Eg New York Times Co. v. Sullivan,* 376 U.S. 254 (1964). Similarly, a statement made against the President must be considered a "true threat"; something lesser or which does not constitute a "true threat" will be protected by the First Amendment. Here, the constitutional facts are the elements of the offense which push the conduct outside of First Amendment protection—the use of force, intimidation, or threats; and damage to property.

For example, one district court considered a Rule 29 motion similar to the one made here, wherein defendants argued that their various online posts were protected by the First Amendment. *United States v. Lacey,* No. CR1800422001PHXDJH, 2024 WL 1765673, at *14-15 (D. Ariz. Apr. 23, 2024). During pretrial motions, as here, the district court denied a motion to dismiss based on the First Amendment, noting that if the particular online post constituted an offer to engage in an illegal transaction, then it was not protected by the First Amendment. *Id.* at 15. The court also noted, however, that the United States would need to prove as much at trial. *Id.* Following trial, in consideration of the Rule 29 requirements, the district court again denied defendants motion, noting that "given the jury's verdict as to [defendant], they apparently found that the ads were in fact for prostitution and not for some other purpose such as a lawful escort ad. Thus, in applying the instruction [given to the jury], they necessarily found that the ads…were unprotected speech." Ultimately, the district court stated "there is sufficient evidence for a reasonable juror to find that each [posted ad] was illegal and therefore not protected by the First Amendment." *Id. See also United States v. Harkonen,* No. C 08-00164 MHP, 2010 WL 2985257, at *15 (N.D. Cal. July 27, 2010) (stating that the jury concluded the defendant was guilty of wire fraud, and

"as a result, the First Amendment provides the defendant with no defense from his conviction as it is well settled that the First Amendment does not protect fraud."); *but see United States v. Hayner*, 371 F. Supp. 3d 700, 706 (N.D. Cal. 2018) (giving no deference to a factfinder's assessment of the evidence in evaluating a defendant's speech).

This Court heard pretrial motions regarding the First Amendment claims of Defendant, and at that time properly denied those motions, noting that the Government at trial would need to prove all the elements of § 372 including more than "mere presence, attendance, or abstract agreement. Section 372 requires both an agreement to engage in unlawful conduct and the requisite culpable objective and subjective intent." ECF 276. Essentially, this Court stated that the core constitutional facts would need to be proven. The jury was instructed consistent with that ruling regarding the elements of the offense, as well as how the jury should consider First Amendment issues. ECF 361. The jury also received the correct instructions regarding definitions of force, threats, and intimidation. *Id.* Following those instructions, the jury convicted Defendant.

**b. The Use of Force, Threats, and Intimidation are Not Protected by the First Amendment**

Thus, the question for this Court is whether the believed facts constitute a First Amendment violation. Here, due to the special verdict form, there is no question as to what the jury believed and did not believe. The jury *did not* believe that Defendant conspired to injure an officer of the United States, and the jury *did not* believe that Defendant conspired to injure the property of an officer of the United States. The jury *did* believe that Defendant conspired to prevent by force, intimidation, or threat an officer of the United States from discharging their duties, and that Defendant conspired to injure the property of the United States so as molest, interrupt, hinder, or impede the officer in the discharge of their duties.

Thus, with the jury's decision regarding the core constitutional facts (the use of force, intimidation, or threats; or the injuring of property) considering the definitions provided by the Court, is Defendant's conduct protected by the First Amendment? Is a defendant permitted to work with others in an effort to use force, intimidation or threats against officers who are engaging in their duties, or work with others with the intention of damaging property? The answer is no—even if the defendants feel very strongly about their actions, or claim they are peaceful, or have many community supporters. Courts have consistently found criminal behavior such as this not protected; in fact, far less-egregious behavior is regularly found to be properly proscribed in law, which was extensively discussed in pretrial briefing and is hereby incorporated by reference. ECF 247; see also *United States v. Osinger,* 753 F.3d 939 (2014) (speech integral to criminal conduct is unprotected speech).

Furthermore, the jury also specifically found that Defendant aided and abetted in a conspiracy to impede or injure any officer of the United States in the discharge of their duties. And while Defendant cites *Claiborne Hardware* in support of the idea that the conduct of the crowd cannot be imputed to Defendant, that reliance is misplaced. The facts of that case involved a civil suit by several businesses against the NAACP and other organizations who had organized a years-long boycott of those businesses. *NAACP v. Claiborne Hardware Co.* 458 U.S. 886, 890-91 (1982). The suit also named multiple individuals who had participated in the boycotts. *Id.* Over the course of time, the boycotts involved some violent behavior, and also many individuals who were unequivocally non-violent—simply standing to the side, or holding signs in front of businesses. *Id.* The Court considered the various roles and ultimately held that "civil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence. For liability to be imposed by reason of association alone, it is necessary that the group itself possessed unlawful goals and

that the individual held a specific intent to further those illegal aims." *Id.* at 920. Further, "the government has the burden of establishing a knowing affiliation with an organization possessing unlawful aims and goals, and a specific intent to further those illegal aims." *Id.* Thus, the "store-watchers" who stood in front of the businesses, or those who organized the boycott of the businesses, could not be held liable for the violent activities during the years of the alleged boycott. *Id.*

Those facts do not align with what occurred here. True, if Defendant the day before had urged people on to go protest and nothing more, they might be akin to the organizer of the boycott in *Claiborne Hardware*. Or if they had stood across the street, like hundreds of others, and watched what occurred, perhaps even recording on their phone, they might be akin to the "store-watchers" who could not be accountable for violent acts. But that is not what was presented, and not what the jury found. Of the hundreds of individuals present outside the HSI facility on June 11th, the grand jury indicted 9 individuals. Six of them pled guilty, admitting that there was indeed a conspiracy. This is not a prosecution of the "entire collective effort…rather than holding specific individuals liable" that Defendant contends. ECF 429. Rather, this was an isolated prosecution of a very small number of individuals who engaged in specific acts in furtherance of the obstruction of officers. And unlike *Clairborne Hardware,* with the lawful goal of a boycott of business, here the goal of the conspiracy was not lawful—the goal was to impede officers as stated in the indictment. And critically, Defendant *was* knowingly engaged in the threatening, intimidating, and forceful acts, as outlined above and in the listed exhibits. They were not a passive or outside observer who was simply scooped up in the criminal conduct of others. They *organized* the criminal conduct, participated in it, and then expressed pride that the conduct occurred. They, as *Claiborne Hardware* requires, were part of an organization with unlawful aims, and had the specific intent to further those aims.

**c. Intimidation**

Specifically with respect to intimidation, per this Court's order at ECF 445 (and also described at ECF 446 United States Response to Forral's Rule 29 and Rule 33 Motion, but copied here for ease of reference):

Intimidation or threat require a subjective intent. The speaker or actor must intend to for their words or conduct to intimidate or convey a threat, and those words or conduct must be such that a reasonable person would find to be a serious expression of intent to harm or assault. Those instructions were properly given to the jury at Instruction 16. Furthermore, the Ninth Circuit has analyzed threats and intimidation, ultimately finding that for any alleged threats or intimidation to pass First Amendment scrutiny, the speaker/actor's state of mind must be proven: "speech may be deemed unprotected by the First Amendment as a 'true threat' only upon proof that the speaker subjectively intended the speech as threat". *United States v. Cassel*, 408 F.3d 622, 634 (9th Cir. 2005). Thus, the Ninth Circuit requirements as to what would constitute intimidation without First Amendment protection is exactly what the jury instruction stated and is what the jury found.

Importantly, in consideration of threats and intimidation: an analysis of words and conduct within a context is important. In interpreting a person's intent in the First Amendment context, Courts consistently look at both. *See United States v. Osinger*, 753 F.3d 939 (9th Cir. 2014) (examining a defendant's harassing online posts as well as his surrounding conduct); *Virginia v. Black*, 538 U.S. 343 (2003) (allowing a statute to ban cross burnings with the intent to intimidate); *United States v. Jubert*, 139 F.4th 484, 494-95 (5th Cir. 2025) (stating "context matters" when considering potential protected speech).

A rational juror could find that the totality of the evidence shows an agreement to prevent federal officers by intimidation or threat from discharging their official duties. The term "intimidation" or "threat" in 18 U.S.C. § 372 is narrowly construed by courts to be limited to "true threats." *See, e.g., United States*

*v. Sutcliffe*, 505 F.3d 944, 953 (9th Cir. 2007). Intimidation or threat was properly defined by Instruction No. 16 as a "true threat": (1) the speaker or actor must intend their words or conduct to intimidate or to be a threat, and (2) those words or conduct must also be such that a reasonable person hearing or observing them would foresee that they would be interpreted as a serious expression of intent to harm or assault. In being defined in that manner, a jury could not apply it to legitimate threats to take lawful action. *See United States v. Fulbright*, 105 F.3d 443, 452 (9th Cir. 1995).

Although threat statutes such as 18 U.S.C. § 372 are interpreted in light of the First Amendment, the Supreme Court has "left no doubt that true threats [can] be criminalized because they are not protected speech." *United States v. Hanna*, 293 F.3d 1080, 1084 (9th Cir. 2002) (*citing Watts v. United States*, 394 U.S. 705, 707, 89 S. Ct. 1399, 22 L.Ed.2d 664 (1969)). "A statement is a 'true threat' if a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault." *United States v. Stewart*, 420 F.3d 1007, 1016–17 (9th Cir. 2005) (internal citation omitted). A statement is a "true threat" and subject to criminal liability only when the speaker subjectively intends the speech as a threat or intimidation. *Elonis v. United States*, 575 U.S. 723, 740 (2015) (the United States must prove that a defendant made a communication for the subjective purpose of issuing a threat). A defendant may not be convicted simply because a federal officer subjectively felt threatened or intimidated. *United States v. Johal*, 428 F.3d 823, 827 (9th Cir. 2005) (mens rea "limits the likelihood that a defendant will be prosecuted for mere inadvertent conduct").

Consider, for example, someone stands in front of the police precinct and says "fuck you" to a police officer who exits. Those words, taken alone, would certainly be protected speech. A First Amendment analysis of those words alone would have one result – the speech is protected. But in an alternate scenario where

the speaker rear-ends a police car, gets out of his car goes over to the officer who tries to open the door to his police car, and the speaker pushes the police car door so the officer cannot get out, and says, “Fuck you”. Those words would inform that it was possibly not an accidental collision and the speaker’s actions intend something more. This is why the Supreme Court held in *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) that the First Amendment allows speech to be used to prove motive, intent, and the elements of a crime.

So too here. There is no need to again extensively reiterate what is described above or in other post-trial motion responses. Defendant’s conduct, in conjunction with others, showed an intent to intimidate officers. Any one action, taken in isolation, may not quite reach the burden of showing intent. But when taken as a whole, Defendant’s intent is clear: refusal to move, linking arms with the crowd yelling “fuck you” and other and hostile language, pushing back, moving throughout the area within seconds of agents’ efforts to use a different exit, calling for others to join, coordinating efforts to barricade exits, planning for the risk of arrest, engaging in this conduct for over 9 hours, and then a subsequent voice memo expressing their pride what occurred and discussing their plan on making agents use force. And Defendant even acknowledged that their intention had not simply been to express opposition to immigration policy, but to pressure federal agents to release the detainees. ECF 433-11 at 58. The intent was to threaten and intimidate, in such a way that armed federal agents were forced to bow to their demands. With this evidence, the jury could easily have found that Defendant’s attempts in their testimony to distance themselves from force, threats, and intimidation could not be believed. Defendant’s actions and conduct showed their intent, and the elements of § 372 were met, particularly with respect to intimidation.

And the second element, as listed in the instructions and required by law, was also met. The federal agents who were present that day repeatedly expressed

their fear and concern for their safety, and their actions demonstrated that fear: they retreated inside the building and did not exit until late into the evening. Despite their training and experience and obvious physical advantage when considered individually, these agents had concerns they would be assaulted or harmed. A reasonable person who heard and saw Defendant's and the co-conspirators' conduct throughout the day would have felt the same.

Of course, Defendant stated they did not have an intent to intimidate when they stated they were "risking arrest." ECF 433-11 at 19. Defendant also during testimony claimed they did not believe that they were actually blocking officers in the building or that the officers "were at our mercy." *Id.* at 85. Defendant also stated that it was the officers, not the crowd, that was intimidating. *Id.* at 85. But the evidence showed otherwise. And the jury was free to disbelieve Defendant's statements, and clearly did disbelieve them. A jury which disbelieves a defendant's story is entitled "to conclude that the opposite of [their] testimony [was] the truth." *United States v. Scholl*, 166 F.3d 964, 979 (9th Cir. 1999); *United States v. Kenny*, 645 F.2d 1323, 1346 (9th Cir. 1981).

Even viewing the evidence with a *de novo* standard or without any deference to the jury's findings, the result is the same. The evidence presented showed Defendant working with others to lay siege to a federal building and trap them inside. Federal agents did not leave for hours because they could not, due to Defendant and others' conduct. Agents did not decide to abandon the use of the white bus, attempt to leave the south gate, ultimately retreat inside the south gate, remain inside the federal building, repeatedly call for additional law enforcement assistance, and then fail to leave the building until approximately 9pm that night only with the assistance of a SWAT armored vehicle simply because they did not want to go home. They were intimidated and threatened and were concerned for their safety based on the conduct of the co-conspirators. Defendant and others' coordination across the property, refusal to leave, escalation of behavior as time

passed, linking of arms and fighting against officers, using force to push and push back against the officers' efforts to clear the area, coordinated efforts to barricade gates and block every exit, moving benches and other items to various exit points, moving quickly to the red van as another attempt to exit was made, pushing against local officers who arrived to assist, blocking an entire street as officers used less-lethal munitions, and continuing to work as a team to force officers to deploy escalating tactics for the safety of all involved demonstrates is not First Amendment protected behavior. Defendant uses words like "civil disobedience" and cites to Susan B. Anthony and Martin Luther King Jr. But those important figures and actions in the history of this country have little to with Defendant's criminal behavior. The First Amendment does not encourage lawlessness, and it does not allow for criminal behavior under the guise of free speech.

Throughout briefing, Defendant emphasizes their expressed commitment to nonviolence, including their training and experience in protests. And as was presented at trial, Defendant emphasized to others that they needed to be able to take a punch without throwing one. And if those words were the entirety of the evidence presented at trial, the United States will be in a different position. Defendant also cites cases of far more extreme conduct occurring at protests, as if the fact that Defendant did not engage in the worst criminal conduct meant they engaged in none at all. And while certainly the events of June 11th could have been worse, that does not mean Defendant's conduct did not meet the statutory elements of § 372.

## CONCLUSION

This case is not about political beliefs or disapproval of any current policies. The motivation for the protest could have been any issue on the right or left or in the middle. It does not matter. What does matter is Defendant's conduct. They joined a conspiracy with the intent to use force, intimidation, or threats, and to damage property, to impede officers, and they furthered the aims of that conspiracy

and acted consistent with those aims. The jury heard the United States' and Defendant's evidence, applied the law to those facts, and chose to convict. Defendant's motion for judgment of acquittal should be denied.

Dated: October 26, 2026.

Todd Blanche
Attorney General

*s/ Rebecca R. Perez*
Rebecca R. Perez
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on October 2, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies recipients of electronic notice. I hereby certify that I have emailed the document to the following:

Andrew Wagley

Andrea George

*s/ Rebecca R. Perez*
Rebecca R. Perez
Assistant United States Attorney