Todd Blanche
Attorney General of the United States
Lisa Cartier-Giroux
Rebecca R. Perez
Assistant United States Attorneys
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JAC DALITSO ARCHER,<br><br>Defendant. | Case No.: 2:25-CR-00113-RLP-9<br><br>United States' Response to Defendant's Rule 33 Motion (ECF 430) |

Plaintiff, United States of America, by and through Lisa Cartier-Giroux and Rebecca Perez, Assistant United States Attorneys for the Eastern District of Washington, submit the following Response to Defendant Archer's Rule 33 Motion for a New Trial (ECF 430). The United States responds as follows.

## FACTS

The United States hereby incorporates the facts as outlined in ECF 446, United States Response to Defendant Forral Rule 29 and Rule 33.

## ARGUMENT

Under Federal Criminal Rule 33, "a court may vacate any judgment and grant a new trial if the interest of justice so requires." This decision is within the "discretion of the district judge" and "should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Pimentel,* 654 F.2d 538, 545 (9th Cir. 1981). A reviewing court must be convinced

that "a serious miscarriage of justice may have occurred," and a defendant carries "the burden of demonstrating that standard is met." *United States v. A. Lanoy Alston, D.M.D., P.C.,* 974 F.2d 1206, 1213 (9th Cir. 1992); *United States v. Chang*, No. 16-CR-00047-EJD-1, 2020 WL 5702131, at *9 (N.D. Cal. Sept. 24, 2020) (*quoting United States v. Endicott,* 869 F.2d 452, 454 (9th Cir. 1989). In reviewing the trial evidence, "the district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *Alston,* 974 F.2d at 1213. Newly discovered evidence may be a valid basis for granting a new trial, if the evidence is material and was diligently sought prior to trial, and would probably lead to a defendant's acquittal. *United States v. Hinkson,* 585 F.3d 1247, 1264 (9th Cir. 2009). Jury instructions "contradicted existing Ninth Circuit law at the time they were issued" may also be a valid basis for a new trial, although such errors may still be harmless and the "burden on the defendant is heavy" to show such an error. *United States v. Kramer*, No. 16-CR-00322-EJD-1, 2020 WL 5408165, at *5 (N.D. Cal. Sept. 9, 2020) (quoting *United States v. Thongsy,* 577, F.3d 1036, 10434 (9th Cir. 2009); *United States v. Espino,* 892 F.3d 1048, 1053 (9th Cir. 2018).

**1. This Court's Rulings on Motions in Limine**

During pretrial motion practice, both sides filed lengthy briefing regarding various trial issues. Since the beginning of the case, Defendant portrayed this case as solely political, focusing on DOJ policies and the policies of the current administration. The United States has consistently disputed this characterization, arguing this case is about criminal conduct, and any charging decisions had nothing to do with any sort of political climate or political directive from the current administration. In light of those contrasting viewpoints, the United States filed ECF 262, a motion to exclude various points or arguments which the United States believed were not relevant or would be unduly prejudicial or inflammatory at trial. This Court excluded some of the requested argument and allowed some.

ECF 297. Motion in limine rulings often limit the arguments of either side, or sometimes even create a bit of an awkward situation to navigate as facts are presented. For example, the United States was unable during trial to point out that 6 of the 9 co-conspirators pled guilty and in fact admitted that a conspiracy to impede officers through force, intimidation, or threats, and destruction of property existed. ECF 198, 106, 211, 219, 222, 231. Although it was awkward to navigate, the Court would be correct that such information would have been improper evidence for the jury. Here, Defendant too was not able to present every single fact they may have wished to present. But that does not mean those facts were admissible, and in light of the overall case and the applicable rules of evidence and criminal procedure, nothing about those rulings was such that a "serious miscarriage of justice occurred" which warrants a new trial.

First, Defendant states they were barred from explaining their comments regarding "risking arrest." The plain meaning of this statement and what Defendant testified to is that Defendant knew they were in some way violating the law and could be arrested. Defendant further testified, albeit not believed by the jury, they were intending civil disobedience. Defendant contends that this statement was made solely based on aggressive DOJ policy and since they could not discuss DOJ policy, they could not explain the context of the statements. To be clear, the only arrests which did occur that day were based on local law enforcement decisions, as was introduced at trial. The federal government made zero arrests on June 11th. And so any supposed explanation about anything regarding federal policy was not relevant—federal policy had nothing to do with the on-the-ground decisions made by the Spokane Police Department and Spokane County Sheriff's Department. And the United States disputes the characterization of "aggressive" DOJ policy. Finally, even if some supposed aggressive actions had occurred previously somewhere else in the nation, they would not be relevant to any of the events in Spokane on June 11th. But aside from that, if Defendant wished to explain their statements, the Court

indicated they could: they apparently believed improper arrests were sometimes made. This can easily be stated without delving into Defendant's supposed knowledge of the inner workings of DOJ. This Court's order on the second pretrial motions acknowledged that Defendants would be allowed to testify to their mental state regarding the charged offense. There is nothing about this Court's ruling that impeded Defendant from doing so or unduly prejudiced their defense.

Second, Defendant contends they were barred from contesting that law enforcement was engaged in their duties. This Court's order on the second pretrial motions at ECF 297 addressed, based on the United States' motion, the exclusion of mention of Joswar Torres' deportation proceedings following the events of June 11th. In that discussion, this Court stated that the conclusion of whether an officer was acting unlawfully or not was a "legal conclusion which should be (or should already have been) presented to the Court," implying that Defendants may not argue that because Mr. Torres was later released, the federal agents were acting unlawfully. ECF 297 at 8. Even so, there was mention throughout trial of what officers were doing during the day on June 11th, and the fact that Defendants believed the individuals inside the HSI were minors who had been unlawfully detained. This Court correctly determined that allowing defendants to claim the officers were unlawfully engaged in their duties was not appropriate under law, as it would have permitted the defendants to argue, for example, that the current administration was acting unlawfully or inappropriately and therefore their policy directives to federal agents were unlawful—which is what Defendant clearly wished to do.

Third, in the midst of jury selection, close to the end of the first day as the parties were questioning dozens of individual jurors about their potential knowledge of the case, this Court stated the following to the parties:

Nevertheless, that doesn't change the fact that voir dire -- attorney-conducted voir dire is going to be targeted to follow-up questions. Please do not bring in politics. Please do not bring in politics, even outside the presence of the jury, and especially when we're in front of the entire jury. Both sides. Just accept the witness at their answer so that we just move on.

And I will try myself to answer some of the -- ask some of the follow-up questions if necessary because that might be a little bit less intimidating to the person, but we need to get through this and get through it quickly, as quickly as possible.

And, you know, my goal with these things -- and I'm naive, I'm a Pollyanna, I get it. I want every single juror to leave this courtroom thinking our judicial system works and it's not about politics. And that's part of the reason why I say that. This case is about what happened and whether or not a crime was committed. It is not about people's positions regarding administration one way or the other.

And I pride myself in making sure that everybody who comes in my courtroom feels that way, and I want everyone that's in this courtroom for voir dire to feel that way. I'm not saying it as a criticism. I'm just saying that's what's motivating me to want to make sure that everybody that comes in here feels like our system is working and people are judged by their evidence and not by politics.

This accurate statement of the criminal justice system by this Court was a reminder to the parties of what this case was about—not politics, not administration policies, but whether or not Defendants violated the law based on the admissible evidence. This Court expressed its desire that jurors not be selected or not based on their political viewpoints, a desire that was not improper and did not actually exclude any specific evidence but rather provided appropriate guidance for the parties in their individual questioning. *See United States v. Jones,* 722 F.2d 528, 530 (9th Cir. 1983) ("the trial judge is given wide latitude to determine how best to conduct the voir dire.").

Defendant now contends that this statement to the lawyers during jury selection was a broadly sweeping prohibition on Defendant discussing "anything relating to government" or "government affairs", which therefore prevented them from explaining their motivations for protesting. ECF 430 at 12. Not true. This statement from the Court did not prevent Defendant from continuing to explain their intent behind their actions that day, as they testified to and was brought up throughout trial, and was specifically stated as being appropriate evidence at several points during trial. *See* ECF 433-11 at 37, 53, 55, 57, 88. But this Court appropriately put limits on that testimony, per Federal Rule of Evidence 403, and did not permit Defendants or the United States to veer off into personal opinions pertaining to broad political policies which did not bear on the specific events of June 11th. Defendant was in no way prevented from presenting the evidence relevant to this case but was appropriately prevented from turning this case into a political circus and opining on broad matters which would confuse the issues, create undue delay, waste time, or needlessly introduce cumulative evidence.

**2. The United States' Witness Testimony**

Throughout trial, various officers and agents, as well as defense witnesses, testified regarding their perceptions. They testified to what they observed, how those observations made them react, and, consistent with the United States' burden

at trial, whether those observations and interpretations made them feel threatened or intimidated. Defendant frames this very ordinary questioning as expert testimony, claiming the officers who testified to their perceptions and reactions were testifying as lay experts who were required to be noticed as such.

The "stark" example cited to is from Agent Tomaso, who, when asked why he did not feel it safe to enter walk into the crowd at the south gate, stated "because we're outnumbered, for one. And also, in my experience, when there's a large group of people gathered together, there's kind of a mob mentality that takes over and a lot of people do things, violent things." ECF 433-1 at 44. Defendant did not object. *Id.* Later, Agent Tomaso described his observations of Defendant and others linking arms. When asked if he had seen that technique before, Agent Tomaso responded that he had. He was then asked what he perceived at the time he engaged with Defendant was the purpose of linking arms. He responded "the purpose is to be stronger. It's easy for one person to be moved, but they link arms with other people, it's harder to move them.". ECF 433-1 at 45. Agent Tomaso then stated that when the linked arms were broken, he was able to move Defendant. But when they re-linked arms, and they maneuvered behind one another to use their body weight to push against the person being pushed by him, he was again unable to move Defendant or the others linked with them. *Id.* Again, Defendant did not object to this testimony at that time.

These explanations by Agent Tomaso are not remotely in the realm of expert testimony—it is simply what he saw happening. He saw linked arms, he could not move the person; the arms became unlinked, and he could move the person. He saw a group of individuals coordinating and using force against him and he did not feel safe to continue or to escalate. That's it. Defendant was free to cross-examine on these observations. There is nothing here which offends the interests of justice so that a new trial is warranted.

**3. Jury Instructions**

a. Specific Intent Instruction

Defendant complains that the Court improperly instructed the jury of the intent element as to the crime of Conspiracy because it did not grant the request for a separate specific intent instruction. *See* ECF 430 at 16-17. Defendant claims that because the jury needed to find that co-conspirators had specific intent to use force, intimidation, or threats, the jury instructions given were inadequate and required a separate specific intent instruction. *Id.* Defendant cites the Ninth Circuit opinion in *United States v. Ehmer*, 87 F.4th 1073 (9th Cir. 2023) regarding the requisite scienter, but fails to include that the panel found that the district court's instruction, an instruction that this Court practically mirrored, did in fact include such a scienter requirement:

> We agree that, under § 372, "the crucial element separating legal innocence from wrongful conduct," *Elonis*, 575 U.S. at 737, 135 S. Ct. 2001 (citation omitted), is that the defendant conspires to prevent an employee from discharging his or her duties "by force, intimidation, or threat," see 18 U.S.C. § 372. It follows that, absent some textual indication to the contrary, a "culpable mental state" must presumptively be shown with respect to that element. *Rehaif*, 139 S. Ct. at 2195 (citation omitted). There is no such language in § 372 that would rebut this presumption of scienter, and Patrick and Thorn are therefore correct insofar as they contend that the Government was required to establish scienter with respect to the use of "intimidation" or "threat[s]." But they overlook that the district court's instruction did include such a scienter requirement, because it expressly stated that, "[i]n order for speech or expressive conduct to qualify as 'intimidation' or a 'threat' in this context, the speaker or actor *must intend his or her words or conduct to intimidate or to be a threat*" (emphasis added). That instruction thus fully complied with the relevant holding of *Elonis*. As Patrick and Thorn note, **the district court's instruction further provided that "speech or expressive conduct" would not qualify as a "threat" or "intimidation" unless the jury also found that "those words or conduct [were] such that a reasonable person hearing or observing them would foresee that they would be interpreted as a serious expression of intent to harm or assault**." *See also United States v. Keyser*, 704 F.3d 631,

> 638 (9th Cir. 2012) …. By requiring both the sort of true threat required under Orozco-Santillan and a subjective scienter that is constitutionally sufficient under *Elonis* and *Counterman*, the district court's instructions here correctly defined the scope of "threats" and "intimidation" required by § 372. (emphasis added).
> *Ehmer*, 87 F.4th at 1120-1121.

This Court was very cognizant of both *Elonis v. United States*, 575 U.S. 723 (2015) and *Ehmer* decisions, as well as several other precedential opinions, during the parties' discussions regarding defining true threats and subjective scienter for the jury. These decisions also were repeatedly cited by the parties in the pretrial litigation of this matter. Tracking *Ehmer*, in Instruction No. 16, the Court instructed the jury:

> In order for speech or expressive conduct to qualify as "intimidation" or a "threat" in this context: (1) the speaker or actor must intend their words or conduct to intimidate or to be a threat, and (2) those words or conduct must also be such that a reasonable person hearing or observing them would foresee that they would be interpreted as a serious expression of intent to harm or assault.
> ECF No. 361 at 16 (Instruction 16).

The Court's instruction therefore did in fact require the jury to find specific intent to engage in conduct outside of constitutionally protected activity and gave the intent requirement of the offense charged[1].

Defendant further complains that because the Court did not depart from the Ninth Circuit's Model Instruction on Conspiracy as the district court did in *Ehmer*, it improperly instructed the jury as to the intent element of conspiracy to commit a crime. ECF No. 430 at 18. To convict a defendant of conspiracy, the United States

---

[1] In his motion, Defendant claims that the United States' closing argument "underscored the prejudice" in a portion of the United States' argument where the prosecutor was reading through Instruction Number 16, which defines knowingly, as it is used in the statement set forth in Instruction No. 14. There is patently no prejudice from the prosecutor's argument when read in context and considering the Court's instructions. *See* ECF No. 431-7 at 26-29.

"must establish (1) an agreement to engage in criminal activity, (2) one or more overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime". *United States v. Johnson*, 297 F.3d 845, 868 (9th Cir. 2002). In other words, there must be sufficient evidence to show that a defendant willfully participated in the conspiracy with knowledge of an illicit objective(s) and with the intent that the illicit objective(s) be achieved. The Committee on Model Jury Instructions for the Ninth Circuit recommends avoiding an instruction on specific intent because distinctions between specific and general intent are likely to confuse the jury. 9th Cir. Crim. Jury Instr. 4.5 comment (2022). Instead, the committee recommends that instructions contain a precise definition of the mental state required for the offense charged. Through Instruction Nos. 15 and 16, the Court properly instructed the jury as to the intent element.

**b. Jury Instruction on First Amendment Protections**

A specific jury instruction was provided describing the general First Amendment protections. ECF 361, Instruction 18. This was of course read in conjunction with the other instructions providing the elements of the offense and the general requirements of conspiracy

Defendant argues that the First Amendment instruction was insufficient because it failed to state that "the first amendment does not permit the government to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." ECF 430 at 19 (quoting *Brandenburg v. Ohio,* 395 U.S. 444, 447 (1969). Defendant also contends that the instruction as insufficient as it failed to state that "liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence." ECF 430 at 19 (quoting *N.A.A.C.P v. Claiborne Hardware,* 458 U.S. 866, 919 (1982).

The First Amendment instruction given by the Court (ECF 381, Instruction 18) was not designed to be a treatise in First Amendment law. It does, however, state the essential legal elements for the jury to consider. And importantly, this instruction must be read in conjunction with others. Instruction 15 listed the elements. Instruction 16 defined some of those elements, providing descriptions for "force," "threat", "intimidation". The given definition for threat was "threaten[ing] or result[ing] in harming or destroying property or harming or killing people. Merely tensing up or merely resisting does not, by itself, constitute force." And importantly, as indicated previously in this response, Instruction 16 also stated the following:

> In order for speech or expressive conduct to qualify as "intimidation" or a "threat" in this context: (1) the speaker or actor must intend their words or conduct to intimidate or to be a threat, and (2) those words or conduct must also be such that a reasonable person hearing or observing them would foresee that they would be interpreted as a serious expression of intent to harm or assault.

Thus, the jury *was* provided an instruction which addressed Defendant's first concern. The required lawless action was defined, provided to the jury, and the jury determined that an agreement to commit such action did occur.

Furthermore, Instruction 14 provided the law surrounding conspiracy. It stated "…a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor by merely knowing and a conspiracy exists." This instruction was copied from the Ninth Circuit Model Instructions 11.1, and is therefore Ninth Circuit approved language for what Defendant now proposes. In sum, the given jury instructions regarding First Amendment and conspiracy issues do indeed encompass Defendant's arguments.

Defendant again, consistent with their Rule 29 motion and their pretrial motions, characterizes their conduct as peaceful protesting. But again, consistent with the responses to those motions, assigning a label to criminal conduct does not

change the conduct and determining questions of fact and then applying the law as given by the district court to those facts is the province of the jury. The jury was instructed on the elements, even the requirements suggested by Defendant. And in light of those instructions, the jury found that Defendant's conduct met the elements of the offense charged.

**4. Closing argument**

Defendant now alleges that the prosecutor misstated the law and fact in its closing argument. Defendant did not object to the prosecutor's arguments during or after closing.

The Supreme Court stated in *Boyde v. California*, 494 U.S. 370, 384 (1990):

> [A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence …, and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law. Arguments of counsel which misstate the law are subject to objection and to correction by the court. E.g., *Greer v. Miller*, 483 U.S. 756, 765–766, and n. 8, 107 S. Ct. 3102, 3109, and n. 8, 97 L.Ed.2d 618 (1987). This is not to say that prosecutorial misrepresentations may never have a decisive effect on the jury, but only that they are not to be judged as having the same force as an instruction from the court. And the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made. *Greer, supra*, at 766, 107 S. Ct., at 3109; *Darden v. Wainwright*, 477 U.S. 168, 179, 106 S. Ct. 2464, 2470, 91 L.Ed.2d 144 (1986); *United States v. Young*, 470 U.S. 1, 11–12, 105 S. Ct. 1038, 1044–1045, 84 L.Ed.2d 1 (1985); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S. Ct. 1868, 1873, 40 L.Ed.2d 431 (1974) ("[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations").

Defendant now argues that it was inappropriate for a juror to consider the definition of an "officer's property" to mean anything other than "government

property". ECF N. 430 at 22. This issue was in part briefed after a pretrial motion to strike filed by Forral. *See* ECF 245. In their pretrial motion, Defendant Forral cited an unpublished out-of-Circuit case, *United States v. Hopper*, 436 Fed. Appx. 414 (6th Cir. 2011) in support of the assertion that "property" under clauses [(3)] and [(4)] of 18 U.S.C § 372 must be the officer's personal property. On appeal to the Sixth Circuit, the defendant in *Hopper*, who had taken the officer's personal property, asserted that the prosecution was required to prove the property was property of the government. *Hopper*, 436 Fed. Appx. at 425. The Sixth Circuit rejected the defendant's argument to narrowly define "officer's property", citing that the clause of § 372 for which the defendant was convicted "simply requires an intent to injure an individual in his person or property, that the individual is an officer of the United States, and that the injury is planned to occur while the individual is engaged in the lawful discharge of his duties … [and] the statute also says 'his person or property,' not government property such as the mail." *Id.* citing § 372. Now Defendant argues that "property of the officer" exclusively means "government property". ECF No. 430 at 22.

However, the word "ownership" rightfully does not appear in the statute, and the legal definition of possession is also not ownership. *See United States v. Sellers*, 670 F.2d 853 (9th Cir. 1982) ("Under the common law, the person last in actual possession of property retains constructive possession until he abandons it, gives it to another person, or until another person otherwise acquires actual possession. 3 Wharton's Criminal Law, Larceny s 369 (1980); 50 Am.Jur.2d, Larceny s 22 (1970); 52A C.J.S. Larceny s 17 (1968)"). The settled principle of statutory construction is that absent contrary indications, Congress intends to adopt the common law definition of statutory terms. See *United States v. Shabani*, 513 U.S. 10, 14 (1994). Had Congress wanted to limit "the officer's property" to government property it would have defined property as such as it does in other statutes. *See* 18 U.S.C. § 136. Interpreting § 372 otherwise circumvents the

purpose of the statute, which is to criminalize actions that interfere with official duties of federal officers by injuring property in their possession or custody and control – whether it is the officer's personally-purchased property, property contracted by the United States, or it belongs to the United States and is in the possession or custody and control of the officer to aid him in the discharge of his official duties. What matters here is that it was property being used by federal officers for the express purpose of fulfilling their duties and that is exactly what Defendant and the co-conspirators believed and why they did what they did to disable the white bus, barricaded the gates with objects that could damage them upon opening or if vehicles drove over them, and placed objects under the red van and slashed the tires. Where the property is being used by the officers to fulfill their duties, and Defendant and co-conspirators intentionally act to injure the property to disable it so they cannot do their duties, whether the white bus belongs to the United States, Geo, or the officer, the elements are met of an agreement to injure property for purposes of D. So restricting the definition as Defendant urges the Court would create absurd and inconsistent results where defendants held the same beliefs, same purpose, and did the same acts but for who held the title to the vehicle. Furthermore, defendants did make this same argument at trial, and a rational jury could have agreed with defendants and nonetheless found that the red van as well as the conduct at the gates to the secure lot committed by co-conspirators met the elements.

Defendant complains that the prosecutor also misstated the law as to § 372 with regard to force, threats, and intimidation. The prosecutor, at least twice, directed the jury to follow the instructions. In one such example, the prosecutor stated:

> You are here to decide whether or not I have proven this case beyond a reasonable doubt, deciding each defendant individually. That is the purpose of the instructions. The purpose of the instructions is to guide you. It is to make sure your oath can be fulfilled. Because you are to

> use these instructions and apply the evidence that we've presented to you, by all of the parties, and make a determination of whether or not we've proven our case beyond a reasonable doubt.
>
> ECF No. 431-7 at 24.

With regard to the prosecutor's statement at ECF No. 431-7 at 39 (Vol. VII Tr. 1879: 18-22), the prosecutor was summarizing the testimony of the officers who exited the building at the south gate, specifically SA Tomaso, BPA McIntosh, BPA Wilks, SA McSullivan, and SA Laforte. SA Tomaso stated that at the south gate, when he began to push to clear the way for the vehicle, and he was met with force in return. ECF No. 433-1 at 34-35. When SA Laforte was in the crowd, he was not being punched, but he was repeatedly pushed and he felt threatened. ECF No. 433-5 at 34-35. When the officers retreated because of the increasing numbers and increasing agitation and fear they would be overrun, Tomaso who had looked at his phone heard one person, specifically the reference in Defendant's motion, state, "Are you afraid that no one is coming to get you?" Other agents, including SA Laforte, heard similar statements asking if they were afraid by others at this time. ECF No. 433-5 at 37. The phrase used by the prosecutor, "in order for you to get us out of here … you have to use violence against us" comes directly from Archer's statement in their voice memo that "We were in their way … we collectively made it so that federal officers had to essentially deploy violence in order to leave with the detainees". Trial Exhibit 78, Slide 7. The prosecutor properly summarized the testimony.

Furthermore, the prosecutor never said speech was enough to convict but asked the jurors to look at the totality of the evidence which includes actions and words and "apply the evidence" to the instructions.

Several officers testified that their official duty was to transport the detainees to get them to Tacoma in a requisite amount of time, and that it was in Tacoma where they would be safely housed and have a hearing. ECF No. 433-12 at 5-6. Forral and others were heard screaming and cursing at the officers that they were

violating due process. Defendant testified that they believed the detainees were being kidnapped. Defendant takes issue with the prosecutor's statement in closing which was a comment on the delay in transport. The comment comes from the perspective of the officers whose sole intent was to accomplish their duty to transport the detainees as soon as they could. The prosecutor did not indicate that was the purpose of the conspiracy, but an unfortunate consequence. The purpose of the conspiracy was to prevent the transport and force the release of the detainees, as Defendant testified they had seen others successfully accomplish in other cities.

Defendant's plan was to block the officers from leaving the building and otherwise create pressure on the officers to release the detainees. While Defendant denied that they trapped the officers inside with the detainees, indicating that the officers could leave; they just couldn't transport the detainees as Defendant had the building surrounded. ECF No. 433-11 at 60-62. Defendant's purpose was to put enough pressure on the federal officers by their actions that they would release the detainees. The prosecutor's statement that the plan upon arrival was to block a bus … then once at Cataldo, it was to commit acts to hold the federal officers hostage inside [until they accomplished their purpose] is not unreasonable statement of the events from the evidence presented.

## CONCLUSION

The evidence in this case does not "preponderate heavily against the verdict" or show this Court that a "serious miscarriage of justice occurred." The admitted advice proved beyond a reasonable doubt to a jury that Defendant was guilty. Defendant's motion should be denied.

Dated: October 26, 2026.

Todd Blanche
Attorney General
*s/ Rebecca R. Perez*
Rebecca R. Perez
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies recipients of electronic notice. I hereby certify that I have emailed the document to counsel of record.

*s/ Rebecca R. Perez*
Rebecca R. Perez
Assistant United States Attorney